IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 11, 2005

## STATE OF TENNESSEE v. CHRISTOPHER LANCE SHOCKLEY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2004-A-138     J. Randall Wyatt, Jr., Judge**

_____

**No. M2004-02086-CCA-R3-CD - Filed July 18, 2005**

_____

The defendant, Christopher Lance Shockley, pled guilty in the Davidson County Criminal Court to four counts of aggravated sexual battery, a Class B felony. The trial court sentenced him as a Range I offender to eight years at 100% on each count and ordered that two of the sentences be served consecutively, for an effective sentence of sixteen years in the Department of Correction. The sole issue the defendant raises on appeal is whether the trial court erred by ordering consecutive sentences. Following our review, we conclude that the record supports the imposition of consecutive sentencing. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Edward S. Ryan, Nashville, Tennessee, for the appellant, Christopher Lance Shockley.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On January 23, 2004, the Davidson County Grand Jury indicted the defendant on four counts of rape of a child, a Class A felony, and nine counts of aggravated sexual battery, a Class B felony, based on acts committed against his young stepdaughter, S.C.,[1] who was less than thirteen years old at the time of the incidents. On June 10, 2004, the defendant pled guilty to four counts of aggravated sexual battery in exchange for the dismissal of the remaining counts of the indictment. In accordance

_____

[1]It is the policy of this court to refer to minor victims of sexual abuse by their initials only.

with his plea agreement, the defendant's sentencing was to be determined by the trial court at a later sentencing hearing.

At the July 22, 2004, sentencing hearing, Detective Charles Kenneth Potter of the Metropolitan Police Department's Sex Crimes Unit testified his investigation of the case began on August 29, 2003, upon receipt of a telephone call from a Department of Children's Services ("DCS") caseworker. He and the DCS caseworker interviewed the defendant on September 4, 2003, during which time the defendant admitted to having engaged in "sexual touching" with the victim. Specifically, the defendant admitted he had touched the victim's breasts with his hands fifteen to twenty times, kissed the victim's breasts ten times, touched the victim's clitoris fifteen to twenty times, and touched the victim's "hole" twice. The defendant additionally admitted that the victim had fondled his penis twenty times. Detective Potter testified the defendant told them the victim's mother had walked into the room during one incident to find the victim unclothed. The defendant told them he had explained to the mother that the victim had been hot during the night and he had instructed her to remove her clothing in order to stay cool. Detective Potter testified the victim had just turned thirteen at the time he began his investigation of the case. He said the defendant told him that the abuse began when the victim was twelve years old and that the last incident occurred in June 2003.

On cross-examination, Detective Potter acknowledged the ultimate source of his knowledge of the abuse resulted from the defendant's having "turned himself into [sic]" the social workers at the Parthenon Pavilion, where he had voluntarily gone for treatment. He said the Parthenon Pavilion had notified DCS and that DCS had in turn notified him. Detective Potter conceded the defendant had cooperated with the investigation and been forthright in his admissions. He later added, however, that although the police were not contacted until after the defendant divulged the pertinent information to the Parthenon Pavilion workers, the victim had informed her mother of the abuse one or two days before the defendant checked himself into the Parthenon Pavilion.

DCS Sex Abuse Investigator Autumn Moultry testified that she participated with Detective Potter in an interview of the victim at her school. She said the victim disclosed that she had been sexually abused by the defendant, her stepfather, since the age of eleven. Moultry described the victim's specific revelations:

> [The victim] disclosed that [the defendant] had touched her vagina and her breasts with his hands. She told me that the first time it happened that she was eleven and was in the living room, that he touched her vagina on -- on top of her vagina. And he gave her names for it, such as pussy and fever. [The victim] told me that, eventually, she began to have to sleep in the bed with [the defendant] and would have to massage his penis. And precom in her words, precom would come out of his penis. [The victim] told me that one time she got upset and tried to wipe the precom off of her hand. And [the defendant] did not like that and told her why do you do that, you repulse me.

[The victim] told me that [the defendant] rubs her vagina on the lump between her folds, and that he touched her hole on approximately three occasions and that felt as a gag reflex. She's also stated that . . . at times [the defendant] would ask her . . . if she liked being touched by him. And if she said no, that he would make her feel guilty, would tell her that she thought that he was ugly or that she didn't love him, that she would have to convince him that she did love him and that she did not think that he was ugly.

Moultry testified that when she received the referral on the case, the victim was thirteen years old. She said she believed the abuse had been ongoing for almost two years and had continued up until approximately two weeks before she received the referral. The victim told Moultry that in July 2002, her mother had discovered the victim sleeping without her panties on in a bed with the defendant. Moultry said the victim told her that the sexual abuse continued to occur after that time. Asked if the victim indicated the frequency of the incidents, Moultry replied:

[The victim] told me that it was pretty much every day that it would happen, either that she would have to show him, like, parts of her body, or that, like, she would walk by him or he would grab her on her buttocks or that she would have to show him body parts or -- I know that before the mom found her without her panties, that she was sleeping with him practically every night.

On cross-examination, Moultry acknowledged the first allegations of abuse resulted from a report to her office from the Parthenon Pavilion, and neither the victim nor the victim's family had reported the abuse to DCS prior to that time.

Holly Arnold testified she was entering her fifth year as a clinical therapist with the National Child Advocacy Center. She said she had both a Bachelor's and a Master's of Science in Social Work and was "currently in the licensure process." In her position as clinical therapist, she had counseled the victim in weekly therapy sessions since September 11, 2003. She said that as a result of the abuse, the victim had experienced chronic anxiety; depression; nightmares; feelings of extreme anger, worthlessness, and self-loathing; and "intense panic" whenever she was within five feet of any male. Arnold testified that the abuse had "interrupted" the victim's normal sexual development. She said the victim had stated more than once that she felt she had been "permanently damaged" by the abuse. Arnold testified the victim would continue to struggle with these issues for the foreseeable future and she said she saw "no end in sight" for the victim's current treatment process. Moreover, she testified she anticipated that the victim would need to resume treatment at various "developmental stages" of her life.

Arnold testified that the defendant was a parental figure in the victim's mind. She said the victim related an incident where the defendant fondled her while he was on his honeymoon with her mother. Arnold explained that it was her understanding that the victim had accompanied her mother and the defendant on their honeymoon in Gatlinburg. She said the victim described "very manipulative behavior" on the defendant's part. For example, the victim told her that whenever she

tried to stop the abuse, the defendant "would mistreat her and her mother to the point that she would do anything to get it [the mistreatment] to stop." The victim also described occasions in which the defendant made her go to the basement to apologize to her but instead molested her again while she was in the basement. Arnold said the defendant's abuse of the victim caused "great damage to [the victim's] trust and boundary issues," and resulted in "almost an inability [on the part of the victim] to trust other people" at the current time. She said the victim had been placed in the care of her grandparents as a result of the abuse, which had necessitated that she change schools. Arnold testified that although the grandparents provided a safe and loving home to the victim, the victim wanted to live with her mother and felt that the situation had placed "great strains on family relationships." In sum, Arnold testified that the impact of the abuse on the victim had been "very great." She said she would place her "in the 8 or 9 range," "[o]n a scale of one to ten," in terms of the effect it had had on her life.

On cross-examination, Arnold acknowledged that the victim was in the appropriate school grade and performed well academically. She testified, however, that she believed the victim had become "almost focused, solely, on academics . . . as an escape to get through what she's going through." When pressed, she conceded that her belief that the victim would require further therapy at future points in her development was "speculation." She emphasized, however, that such "speculation" was her "clinical opinion," based on her experience, training, and work with the victim over the previous year.

Dr. Lawrence Okpaku, a psychiatrist, testified on the defendant's behalf that he began seeing the defendant, who presented with depression, on May 22, 2003. He said that the defendant discussed the sexual abuse allegations during the course of his treatment and that he expressed remorse for his actions. Dr. Okpaku stated he believed the defendant could adjust into "the mainstream of life" if given "[a] comprehensive set of services with ample opportunity for supervision and support." On cross-examination, he testified that "central factors" causing the defendant's depression included the "enormity of the charges" against him and the "consequences of losing his wife, going to jail, losing his job." He was unwilling, however, to characterize these as the "main source[s]" of the defendant's depression, stating that the defendant had informed him that his wife had suffered two miscarriages and that he had a family history of depression.

Franklin Cardona testified he held a doctorate in Education and was a "certified Addiction Specialist" and a "licenced . . . mental health provider for the State of Tennessee." He said he had fifteen years of experience working "with sex acts and sex offenders [sic] acts" and had served as a board member on the "International Board of Sexaholics Anonymous." He testified he first began working with the defendant to help him establish what had led to his behavior and to help him deal with the resulting sense of shame and guilt. Dr. Cardona said the defendant, who was sober at the time he met him, had a history of addictions in other areas, including drugs, and was trying to work "on his own sexual sobriety." He testified he recommended Sexaholics Anonymous, which the defendant attended. Dr. Cardona stated that the defendant appeared genuine in his desire to change his life and had made "good headway . . . relative to . . . what happened and gaining some composure" but also required further treatment.

-4-

On cross-examination, Dr. Cardona acknowledged that he was not a member of the Tennessee Sex Offenders Treatment Network, the recognized treatment organization in Tennessee for sexual offenders, and that he was therefore not recognized by Tennessee courts as an approved treatment provider for sexual offenders. He further acknowledged there was a difference between the treatment programs for sex addicts and sex offenders. He testified the defendant told him he had been sexually molested as a child by a babysitter, but he had not independently verified that information. Finally, he conceded he was aware of a study which had found that a significant number of sex offenders falsely claim to have been the victims of sexual abuse.

The defendant's parents, Carl and Frankie Shockley, each testified on the defendant's behalf, expressing their love and support for the defendant.

Angie Stinson, a friend of the defendant who said she had previously worked as a child abuse investigator for the Department of Human Services, testified the defendant was a "very quiet, very sweet, and gentle person," and she did not have any concerns about him being around her seventeen-month-old daughter. According to Stinson, the defendant had talked openly and honestly with her about the abuse, had expressed his remorse, and had worked hard to overcome "a lot . . . of issues." She said that she thought he needed some "intense treatment" but that he was "very salvageable," and she did not believe he was a pedophile.

The defendant, testifying in his own defense, explained the circumstances that led him to seek treatment at the Parthenon Pavilion:

> I noticed that my daughter -- and I know she's my stepdaughter, but I call her my daughter, because I love her that much. And I notice[d] she was starting to become where she didn't want to be around me, and she was kind of scared of me. And I didn't understand at the time what was going on. So I felt, since she was acting this way, that the best interest of her would be for me to leave the home for a while until we figured out why she was feeling this way towards me. So I left the home. And a couple of months later, my wife called me up. And said she needed to talk to me about something. . . . She came over and told me that . . . [the victim] had told her that I had touched her. And that was why she was acting the way she was acting. And when my wife told me that, I -- that was when it, really, sunk in, though, what I had done, that I had messed up with her. And I got to the point to where I didn't want to live then. I just wanted to kill myself at the time. And me and my wife discussed it. And she convinced me that our family was worth fighting for, that I shouldn't just give up and quit and run out. You know, if I, really, loved her and [the victim], that I would be willing to fight for them and do whatever it took to make things right.

The defendant testified he knew that his disclosures about the victim would be reported to DCS and that he had agreed for a DCS employee to interview him while he was undergoing treatment at the Parthenon Pavilion. He said that when she failed to show up, he contacted her upon

his release from the center and arranged to go to her office for an interview. The defendant testified he knew he would be required to serve some jail time for his offenses, but neither he nor his wife had realized "that the D.A. would be this severe about it." He said the situation had "devastated" him. Among other things, he had lost his wife, his "little girl," and his job, been embarrassed, and incurred thousands of dollars in legal expenses. He promised he would never again make the same mistake and said that he would participate in any counseling that was offered.

On cross-examination, the defendant expressed his unhappiness with the amount of time the prosecutor was seeking for the offenses, complaining:

> I knew I was going to have to do some jail time, but I, also, thought there was going to be a possibility of probation, where I could be out and have classes and work to pay off the legal fees. I mean, that's -- how much does someone need to suffer? How much more do I need to suffer before everything is made right?

Asked what he thought would be an appropriate amount of incarceration, the defendant said he thought that one year in jail, combined with a period of probation and counseling, would be fair.

The defendant acknowledged he had been convicted of possession of marijuana when he was eighteen or nineteen years old, but denied that he had ever been convicted of theft under $500. He explained that the latter offense, listed on his presentence report, "was where a mistake was made with [his] cousin, who's not one hundred percent mentally there." He acknowledged he had occupied a position of trust with the victim, which he had violated by his behavior. He refused to acknowledge, however, that the abuse had been ongoing or that the incidents had occurred on dozens of occasions. Instead, he testified that it had been "random," occurring only "[t]hree or four times." Asked about the discrepancy between his present recollection and the number of times mentioned in his statement to Detective Potter, the defendant testified that he had told Detective Potter that the abuse occurred less than ten times "[a]nd y'all [referring to the prosecutor] come up with the number of nine, or whatever, how y'all came up with it."

Following the defendant's testimony, defense counsel informed the trial court that the first two rows of spectators in the courtroom were the defendant's family, friends, and members of his church, all of whom had appeared in his support and were prepared to testify on his behalf, but whose testimony would be repetitive to that of other defense witnesses.

At the conclusion of the hearing, the trial court sentenced the defendant to eight years for each offense, the minimum sentence for a Range I offender convicted of a Class B felony. Finding Tennessee Code Annotated section 40-35-115(b)(5) applicable based on the circumstances surrounding the offenses, the trial court ordered that two of the sentences be served consecutively, for an effective sentence of sixteen years.

## ANALYSIS

The defendant contends on appeal that there was insufficient evidence to support the trial court's imposition of consecutive sentencing. When an accused challenges either the length or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. Thus, the defendant has the burden in this case of demonstrating that the trial court erred in its sentencing determinations.

Under Tennessee Code Annotated section 40-35-115, the trial court has the discretion to order consecutive sentences when it finds any one of a number of different criteria to exist by a preponderance of the evidence, including the following:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Tenn. Code Ann. § 40-35-115(b)(5) (2003).

In finding criterion (b)(5) of Tennessee Code Annotated section 40-35-115 applicable, the trial court noted the aggravating circumstances arising from the defendant's relationship with the victim, the length of time the abuse had continued undetected, and the negative impact it had had on the victim:

> I think, under the judgment of this Court, that this man should be sentenced to what is, actually, the minimum sentence, under the law, for each of these four counts, which is eight years, at one hundred percent. But I, also, think that under Section 40-35-155(5) [sic], where you have two or more statutory offenses involved in sexual abuse of a minor -- this is a[n] eleven, twelve-year-old -- and that aggravating circumstances arising from this relationship have impacted this little girl as it has, and where there is a time span of, maybe, two years in this case of undetected sexual activity. I couldn't believe when I heard that, apparently, when this man was going on his honeymoon, this is when this first happened, apparently, in Gatlinburg, according to . . . the testimony of . . . Ms. Arnold, and apparently, went on for a period of time after that.

> So I think the nature, the extent of the acts, the residual, physical, and mental damage to this little girl, everything I've already said before, causes this Court to believe that at least one of these counts should run consecutively to the other.

On appeal, the defendant cites State v. Hayes, 899 S.W.2d 175, 187 (Tenn. Crim. App. 1995), to argue that there was insufficient evidence of any residual damage the victim suffered as a result of the abuse and, thus, insufficient proof to support consecutive sentences under criterion (5) of the statute. Specifically, he argues that the trial court "relied upon the testimony of an unlicensed therapist that the victim would undergo residual physical and or mental damage," but "[t]he fact is . . . the therapist said she could not tell what would happen in the future and . . . was basing this on things she thought might happen." The State argues that the record fully supports the consecutive sentences ordered by the trial court. We agree with the State.

The defendant in Hayes was convicted by a jury of two counts of aggravated sexual battery against his daughter and sentenced by the trial court to consecutive terms of twelve years as a "dangerous offender." Id. at 178, 187. On appeal, the State conceded that the defendant did not qualify as a dangerous offender but, stressing the parent-child relationship between the defendant and the victim, argued that consecutive sentences were warranted under criterion (5) of the consecutive sentencing statute. Id. at 187. We disagreed, noting, among other things, that "the extent of residual damage to the victim caused by the conduct" was not sufficiently shown. Id.

Unlike the case at bar, the sole evidence in Hayes of any damage the victim suffered as a result of the abuse consisted of a letter by her mother, contained in the defendant's presentence report, "indicating that there had been a lot of 'tears and despair' for the victim both from the events and from having to testify against her father." Id. at 184. By contrast, detailed evidence was presented that the victim in the case at bar had suffered and was continuing to suffer numerous

deleterious effects of the abuse. Although Holly Arnold, the clinical therapist employed by the Child Advocacy Center, conceded she could be wrong in her belief that the victim would require further therapy at future points in her development, she unequivocally testified that the victim had suffered great emotional distress and damage as a result of the abuse. In fact, she said that out of all the children of sexual abuse she had counseled over the years, she would place the victim as a nine on a scale of one to ten in terms of the negative impact the defendant's actions had had on her life. According to Arnold, as a result of the abuse, the victim suffered depression, chronic anxiety, feelings of anger and self-loathing, intense panic in the presence of any male, and a near-inability to trust. Moreover, she described the victim as still being in a state of emotional turmoil at the time of the hearing and said she saw no end in sight to the victim's current course of treatment, which involved weekly therapy sessions.

Arnold also testified that the victim's close relationship with the defendant, whom she viewed as a father, made his betrayal of her trust that much more devastating. She said the defendant engaged in manipulation to further the abuse. As an example, she testified that the victim related that the defendant would mistreat her and her mother whenever she tried to resist the abuse. DCS Sexual Abuse Investigator Autumn Moultry also testified with respect to the manipulative tactics the defendant employed, stating that the victim told her that the defendant tried to make her feel guilty, accusing her of not liking him, whenever she told him she did not like touching him. Both Moultry and Arnold testified that the victim told them the abuse began when she was only eleven years old. According to Moultry, it continued undetected for almost two years, with the last episode occurring only two weeks before her referral on the case. The evidence, therefore, was more than sufficient to support a finding that criterion (5) of the consecutive sentencing statute applied under the circumstances presented by the case.

In his argument against consecutive sentencing, the defendant also points out that he voluntarily admitted himself for treatment to the Parthenon Pavilion, disclosed the abuse to the counselors with the knowledge that they would report it to DCS, and cooperated fully with the resulting investigation. We note, however, that from the defendant's own testimony, his "voluntary" admission occurred only after the victim's mother had confronted him with her knowledge of the abuse. Moreover, the defendant was less than forthright in his testimony at the hearing about the nature and frequency of the abuse. We, therefore, conclude that the trial court did not err in ordering consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(5).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE